# EXHIBIT A

JERRY L. CARNLEY, JR.       §
      §
     Plaintiff,       §
      §
VS.       §
      §    IN PRIVATE ARBITRATION
HUMAN SERVICES OF SOUTHEAST       §    BEFORE JUDGE JOSEPH "TAD"
TEXAS, INC. d/b/a SPINDLETOP CENTER       §    HALBACH
f/k/a SPINDLETOP MHMR SERVICES       §
      §
     Defendant.       §
      §

## ARBITRATION AWARD

This arbitration is between Jerry L. Carnley, Jr. ("Carnley"), Claimant and Counter-Respondent, and Human Services of Southeast Texas, Inc. d/b/a Spindletop Center f/k/a Spindletop MHMR Services ("Spindletop" or "the Center"), Respondent and Counterclaimant.

Carnley's claims were originally filed on May 11, 2018, in Case No. 1:18-cv-00212, in the United States District Court for the Eastern District of Texas – Beaumont Division. Pursuant to Title VII of the Civil Rights Act of 1964, 42, U.S.C. §2000e, Carnley alleged that he had been subjected to a sexually hostile work environment because he was subjected to improper material and images of a sexual nature and witnessed unwanted and improper sexual behavior while at work. Carnley further alleged that he had been retaliated against because he was personally targeted by Spindletop's CEO, Charles Harris, for termination because Carnley knew about an improper relationship between Harris and a female director in the organization which would have forced Harris to resign or be terminated. In connection therewith, Carnley alleges that he had no other alternative than to turn in his resignation on August 14, 2017 because (1) Carnley had come upon evidence of a systematic effort by Harris and Carol Parker, the head of Human Resources, to destroy Carnley's reputation and create a narrative to terminate Carnley without

1

good cause; and, (2) on August 11, 2017, Harris informed Carnley that Harris was going to reassign two divisions that had always been managed by Carnley.

In response, Spindletop denied all Carnley's claims and subsequently moved to have the case dismissed in favor of binding arbitration. On December 20, 2018, the district court dismissed the federal case and ordered the matter to arbitration.

On January 6, 2020, Spindletop filed a specification of claims which included causes of action against Mr. Carnley including (1) Fraud, (2) Conversion, (3) Theft, and (4) Breach of Fiduciary Duty. In connection with these claims, Spindletop alleged that from 2012-2017, Carnley used Spindletop's company funds to purchase personal items and that to preclude Spindletop from discovering same, Carnley falsified receipts for his purchases, which he submitted to Spindletop. In addition, Spindletop alleged that from 2013 to 2017, Carnley paid an alleged IT consultant with company funds of no less than $200,000.00 despite the IT consultants alleged failure to provide any services to Spindletop. In connection therewith, Spindletop further alleged that Carnley used the IT consultant to misappropriate Spindletop funds for Carnley's personal use.

In January of 2020, each side filed Motions for Summary Judgment. Carnley also filed an alternative Motion for Severance. After considering the motions and having heard oral arguments, on February 6, 2020, the panel announced its decisions on the pending motions. The panel denied Carnley's Motion for Summary Judgment and Alternative Motion to Sever. The panel granted Spindletop's Motion for Summary Judgment in part and denied it in part. The motion was granted with respect to any conduct alleged to have occurred prior to April 15, 2017. The motion was also granted as to all claims except for the claim of retaliation. Spindletop's Motion for Summary Judgment was denied as to such retaliation claims.

The final arbitration hearing was held on February 10, 11, and 12, 2020 ("Hearing"). Carnley called ten witnesses, including himself, and presented Plaintiff's (Claimant's / Counter-Respondent's) exhibits 1 through 63, which were offered and admitted into evidence, before resting his case-in-chief. Spindletop called one witness and presented Defendant's (Respondent's / Count-Claimant's) Exhibit 1 through 391, which were offered and admitted into evidence, before resting its case-in-chief. Closing arguments were reserved for post-hearing briefs, which have been submitted. Pursuant to an agreement by the parties made during the Hearing, each side provided attorneys' fees evidence in writing as part of their post-hearing submissions. Having considered the pleadings, testimony of the witnesses, Hearing exhibits, the certified Hearing record, the arguments of counsel, and for good cause shown, the panel now renders this award.

## I. CARNLEY'S CLAIM OF RETALIATION

To sufficiently prove his claim for retaliation, Carnley must show by a preponderance of the evidence that (1) that he engaged in activity protected by Title VII; (2) that an adverse employment action occurred; (3) that the protected activity was the "but for" cause for the adverse employment action. *Evans v. City of Houston*, 246 F.3d 344, 352 (5th Cir. 2001); *Strong v. Univ. Health Care Sys., L.L.C.*, 482 F.3d 802, 806 (5th Cir. 2007).

In his Original Complaint and Response to Request for Disclosure, Carnley claims that Harris targeted him for termination because he knew about an "improper relationship" between Harris, the CEO of Spindletop, and Amber Woods, a female director in Spindletop, which would have forced Harris to resign or be terminated. (*See,* Carnley's Original Complaint, pg. 3, paragraph 9, and Carnley's Response to Requests for Disclosure, pg. 2.) Carnley claims he was constructively discharged after having opposed this "improper relationship" by reporting it to his

brother-in-law, Tom Aardahl, who worked in the Quality Management / Compliance Department at Spindletop, and who Carnley alleged ultimately informed the CEO, Harris.

Nowhere in his Complaint, his Disclosures or his Charge of Discrimination does Carnley make any claim of retaliation for any act other than his "opposition" to the "improper relationship" between Harris and Woods. Indeed, Carnley's Charge of Discrimination is particularly instructive. (See, Defendant's Exhibit 391). Regarding his retaliation claim, Carnley states:

> Finally, I have personally been targeted because I knew about an improper relationship between the CEO and a female director in the organization which would have forced him [the CEO] to resign or be terminated… (Id. at Carnley 00135).
>
> ….
>
> But in late July 2017, I made the mistake of telling my Brother-in-Law, Tom Aardahl, (who also worked at Spindletop) about seeing some disturbing photos/texts Charlie [the CEO] had sent to the female director. Although I hadn't believed it before Charlie and the female Director were having some sort of relationship/affair which would have resulted in Charlie being terminated by the board of directors. Other than my co-worker, Tom was the only person I talked to about what I had seen… (Id. at Carnley 00138-00139).
>
> ….
>
> Fortunately, I did not mention anything about the pornographic material of a serious nature or the female staff that Charlie had violated by photographing them to Tom. So, Charlie was unaware of that evidence… (Id. at Carnley 00139).

It was not until his deposition in November of 2019 and then at the final hearing, that Carnley claimed a second basis for his claim of retaliation: His alleged opposition to the voyeuristic photographs of various female staff members. (See, Spindletop Center's Reply to Plaintiff's Opposition to Spindletop Center's Motion for Summary Judgment, Ex. C, p. 98).[1] While his discovery of pornographic material involving children were part of his harassment claims, they have never formed the basis of any claim for retaliation.

---

[1] As discussed further herein, Carnley further admitted that he did not think the Harris/Wood relationship was sexual harassment or gender discrimination. Id.

## A. Carnley did not engage in any conduct in opposition to any unlawful employment practice.

To gain protection under the opposition clause, a plaintiff must show "conduct by the plaintiff that is in opposition to an unlawful employment practice of the defendant." *Payne v. McLemore's Wholesale & Retail Store*, 654 F.2d 1130, 1136 (5th Cir. 1981).

The credible evidence does not support Carnley's claim of opposition and retaliation. Until his deposition, Carnley claimed one act of opposition – his report to Aardahl of the so-called "improper relationship" between Harris and Woods. Although Carnley claimed at the final hearing that he reported both the Harris/Woods relationship and the voyeuristic female employee photographs, his Complaint, Disclosures, and Charge of Discrimination do not support this. At best, they support only his claim regarding the Harris/Woods relationship. Moreover, Tom Aardahl had no recollection that Carnley reported any concerns to him about Charlie Harris (p. 228-299) – whether it be the Harris/Woods relationship or the voyeuristic female staff photos. If Carnley had informed Aardahl about such serious matters, the panel assumes Aardahl would have remembered.

Carnley makes much that Harris failed to rebut his testimony and instead invoked his 5th Amendment privilege in response to every question. From this, Carnley presumably suggests the panel should infer an admission of retaliation for reporting the Harris/Woods relationship.[2] However, in this instance, the panel declines to do so. More likely than not, Harris' refusal to testify was in response to the criminal allegations of child pornography that were being investigated by local law enforcement and the FBI, and not Carnley's claim of retaliation for

---

[2] The Fifth Amendment does not forbid adverse inferences against parties to a civil action when they refuse to testify in response to probative evidence offered against them. *Baxter vs. Palmigiano*, 425 U.S. 308, 319 (1976).

5

reporting the Harris/Woods relationship.  There is no reason to believe that the privilege would have been asserted otherwise.

## B.    Alleged favoritism because of a consensual relationship between co-workers is not a discriminatory activity.

"[A] Plaintiff may not maintain a claim for 'opposition clause' retaliation where the activity about which [he] complains, even if it occurred, is not actionable under Title VII." *Harvey v. Chevron U.S.A.*, 961 F. Supp. 1017, 1033 (S.D. Tex. 1997).  "Alleged favoritism to a paramour generally has been held not to constitute discrimination in violation of Title VII because the alleged discrimination is not based on the plaintiff's gender." *Harvey v. Chevron U.S.A.*, 961 F. Supp. 1017, 1029 (5th Cir. 1997). Rather, while favoritism towards a paramour "may be unfair, it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders." *Id.* at 1030 (quoting EEOC Notice No. 915-048, at 2). As such, a plaintiff who complains of favoritism towards a paramour does not "complain of any activity protected by Title VII." *Id.* at 1034.

Here, Carnley alleges that Harris retaliated against Carnley for disclosing Harris' consensual relationship with Woods. As in *Harvey,* Woods' relationship with Harris was consensual.  Likewise, if Woods received any favoritism for the relationship, [3] <u>both male and female employees would be disadvantaged.</u> As a result, Harris alleged favoritism towards Woods

---

[3] The evidence showed that Woods received a significant raise because Spindletop Center promoted Woods to Director of the Crisis Stabilization Unit. p 195, line 25 – p 196, line 4. As Frank Coffin, a former police chief and member of the Board of Directors testified, a Spindletop employee who is promoted to a new position receives compensation in accordance with the category that position falls under. p 273, lines 15-21. Moreover, the evidence showed that Woods was qualified for the position of Director of the Crisis Stabilization Unit. p 210, line 18 – p 211, line 15. Woods has a bachelor's degree in psychology, a master's degree in counseling and education, and is a Licensed Professional Counselor. p 197, lines 8-12.

is not actionable under Title VII; Carnley did not, and cannot, establish that Carnley engaged in a protected activity under Title VII. *Compare, id.*

**C.  Carnley did not have a good faith reasonable belief that the alleged favoritism because of a consensual relationship between co-works was a discriminatory activity.**

"To be protected under section 21.005, an employee is not required to show that an actual unlawful practice existed; rather the employee need only show that he had a good faith reasonable belief that the employer engaged in an activity that would be unlawful under Title VII or the Texas Commission on Human Rights Act." *A & L Indus. Servs. v. Oatis*, 2013 Tex. App. LEXIS 13765 (Tex. App.—Houston [1st] 2013, no pet.) *citing City of Waco v. Lopez*, 259 S.W.3d 147, 151 (Tex. 2008).

In his post-hearing brief, Carnley claims "At the very least someone with relatively little knowledge of this area of the law would have had a good faith reasonable belief that [the activities alleged] violated Title VII." Id., at p. 4.  However, despite this assertion, there is no there was no testimony regarding Mr. Carnley's legal knowledge, nor more importantly, the nature and extent of his beliefs.  At the hearing, he stated only that he believed Amber Woods received raises because of her relationship as a woman with Harris and that this discriminated against the other employees at the center.  (p. 559, line 24 – p. 560, line 11).  There was nothing further.  Moreover, as stated above, this testimony is directly contradictory to Carnley's deposition testimony in which he unequivocally states that he did not think the Harris/Wood relationship was sexual harassment or gender discrimination. (*See*, Spindletop Center's Reply to Plaintiff's Opposition to Spindletop Center's Motion for Summary Judgment, Ex. C, p. 98, lines 6-9).

Further, and perhaps most importantly, there is no evidence that when Carnley allegedly reported the relationship to Aardahl that he either believed or told Aardahl there was any discrimination involved - only that an "improper relationship" existed that violated company policy that would likely force Harris to resign or be terminated. Indeed, such an allegation is not made in Carnley's Complaint, Disclosures, or Charge of Discrimination. Not until the final hearing was any mention of financial discrimination made. To the contrary, prior to the final hearing only the only mention was the existence of an "improper relationship." Thus, it cannot be said that Carnley had a good faith reasonable belief of any discriminatory conduct. He did not.

**D.    Carnley's alleged engagement in a protected activity was not the "but for" cause of any alleged adverse employment action.**

To prevail on his retaliation claim, a plaintiff must show by the preponderance of the evidence that the adverse employment action would not have occurred 'but for' the protected conduct. *Strong v. Univ. Health Care Sys., L.L.C.*, 482 F.3d 802, 806 (5th Cir. 2007).

Even if, *arguendo*, Carnley did engage in a protected activity and suffered an adverse employment action, Carnley clearly failed to demonstrate that, but for Carnley's alleged opposition of Harris' alleged discriminatory practices, Carnley would not have felt compelled to resign. The credible evidence shows that Carnley resigned because Spindletop Center was investigating Carnley for misappropriating company funds and property and Carnley was aware of the investigation.

Before the Washington D.C. trip, Heubach had confronted Carnley about Carnley's purchases with company funds. (p. 931, line 14 – p. 933, line 25). After Aardahl, Woods, and Heubach's trip to Washington D.C. and approximately two weeks before Carnley's resignation, Spindletop Center initiated an investigation into Carnley's purchases with company funds. (p.

864, line 24 – p. 865, line 8). The temporal proximity between the initiation of the investigation and Carnley's resignation itself demonstrates Carnley was aware of the financial investigation at the time of his resignation.

Before Carnley resigned he observed video footage which showed Harris meeting with LeBlanc and Heubach, both of whom work in accounting. (p. 568, lines 1-22; *see also*, Defendant's Exhibit 390, CARNLEY 00139). Moreover, Carnley had a tendency of reading other employees' emails and monitoring other employees' computer activity (p. 858, line 16 – p. 859, line 9; p. 216, lines 14-19). Additionally, on August 7, 2017, only four (4) days before Carnley resigned, Harris reimbursed Carnley for a class ring Carnley had purchased for Harris as a gift. (p. 743, lines 8-24; Defendant's Exhibit 388).

Lastly, because the evidence shows that Carnley in fact misappropriated large sums of company funds over several years, Carnley knew Spindletop Center would fire Carnley after the investigation concluded. (*See*, below). Thus, regardless of what the evidence may have shown regarding Harris's conduct after the trip to Washington, D.C., the panel finds that the reason Carnley resigned was because he knew of the investigation into his financial affairs, what that investigation would reveal, and that he would surely be fired because of the findings.

E.    **Carnley is not entitled damages.**

Having failed to prove his claim for retaliation, Carnley is not entitled to recover damages. However, even if this were not the case, Carnley's damages, if any, would cease to accumulate on the date Harris resigned and Borel became Spindletop Center's CEO.[4] As Borel

---

[4] On or about December 15, 2017, Spindletop Center hired Borel as the CEO. p, 365, line 3 – p 365, line 18.

testified at the hearing, if Carney had not resigned, Borel would have fired Carnley for misappropriating company funds. (p. 407, line 19 – p. 408, line 16).

**F.     Carnley should take nothing on his claims.**

For all the reasons stated above, the panel finds that Carnley should take nothing on his claims for damages as follows:

1.   Back Pay:                    $0.00

2.   Compensatory Damages:        $0.00

3.   Punitive Damages:            $0.00

4.   Attorney's Fees:             $0.00

## II.  THE CENTER'S COUNTERCLAIMS

The Center asserts four counterclaims against Carnley: 1) Statutory Theft, 2) Conversion, 3) Breach of Fiduciary Duty and 4) Fraud in the Inducement.   In his Motion for Summary Judgment, Carnley alleged as a defense the statute of limitations.   In response, Spindletop Center asserted the discovery rule.   The panel will first address the applicable statutes of limitation and the application, if any, of the discovery rule.

**A.     Spindletop Center's Claims for Statutory Theft and Conversion are barred by the Statute of Limitation.**

Under Texas Penal Code § 31.03(a), a person commits theft if that person unlawfully appropriates that person's property with the intent to deprive the owner of that property. Appropriation of property is unlawful if it is (1) without the owner's effective consent; or (2) the property is stolen, and the actor appropriates the property knowing it was stolen. Texas Penal Code § 31.03(b).  "A person who commits theft is liable for the damages resulting from the theft." Tex. Civ. Prac. & Rem. Code 134.003(a).

Conversion is "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex. 1971).

The parties agree that the statute of limitations for both statutory theft and conversion is two (2) years. The alleged thefts and conversions in this case occurred from 2012 until August of 2017, when Carnley resigned. However, Spindletop did not file its specification of claims until January 6, 2020, well past the running of the statute. Thus, on their face, both claims are time barred.

In response to Carnley's Motion for Summary Judgment, Spindletop asserted the discovery rule. When applied, the discovery rule tolls the running of limitations until the plaintiff discovers the injury, or acquires knowledge of facts which, in the exercise of reasonable care and diligence, would lead to the discovery of the wrongful act and resulting injury. *Li v. University of Texas Health Science Ctr. At Houston*, 984 S.W.2d 647, 652 (Tex.App.-Houston [14th Dist.] 1998, pet. denied) In cases where the discovery rule applies, accrual occurs, and limitations begin to run, when the plaintiff knew or should have known of the wrongfully caused injury, not when the plaintiff knew of the specific nature of each wrongful act that may have caused injury. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 749 (Tex.1999). Once a plaintiff knows, or in the exercise of reasonable diligence should have known of the injury, "the limitations clock is running, even if the claimant does not yet know; the specific cause of the injury; the party responsible for it; the full extent of it; or the chances of avoiding it." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 93-94 (Tex.2004).

Assuming the discovery rule applies and even assuming the very earliest Spindletop reasonably could have discovered the thefts and conversions was November 9, 2017[5], any alleged theft or conversion that occurred prior to November 9, 2019, is time-barred under the two-year statute of limitations.

As such, the panel finds that Spindletop should take nothing on its claims of statutory theft and conversion. And because the parties further agree that the only claim for which Spindletop would be entitled to recover attorneys' fees is statutory theft, the panel finds that Spindletop should take nothing on its claim for attorney fees and expenses.

This leaves Spindletop's two remaining claims – 1) breach of fiduciary duty and 2) fraud in the inducement.

## B.    Spindletop's claims for Breach of Fiduciary Duty and Fraud are not barred by the Statute of Limitations.

The parties agree that the statute of limitations for breach of fiduciary duty and fraud is four (4) years. Thus, unless the discovery rule applies, any claim prior to January 6, 2016, would be time-barred. However, in this case, the panel finds that the discovery rule applies. To that end, the panel finds the earliest Spindletop could reasonably have discovered its claims for these torts is in August or September of 2017, just after the meeting in Washington, D.C., and at such time as when Harris instructed LeBlanc to begin her investigation and she found the first instance of misappropriation. Before then, it cannot be said that Spindletop knew or should have known of the injury. This is particularly true given the nature of Carnley's acts. To carry out his scheme, Carnley had to fraudulently conceal his actions and that is exactly what he did. The

---

[5] November 9, 2017 is the date of LeBlanc's statement to the Beaumont Police Department. Obviously, to have prepared the statement, she necessarily would have discovered the thefts sooner. Indeed, her investigation began in August of 2017. Thus, arguably the discovery occurred much earlier than the date of the police statement.

evidence is replete with instances of altered expense and credit card records. As a fiduciary he was in a unique position of trust and he abused that trust. Hence, Spindletop's claims for breach of fiduciary duty and fraud are not barred by the statute of limitations.

## C. Carnley breached his Fiduciary Duty and committed Fraud.

As more particularly discussed below, Carnley breached his fiduciary duties to the Center and committed fraud by misappropriating company funds and property for his own benefit.

The elements for a claim of breach of fiduciary duty are 1) a fiduciary relationship between the parties; 2) a breach of the duty created by that relationship; and 3) injury to the claimant or benefit to the respondent because of the breach. *Anderton v. Cawley*, 378 S.W.3d 38, 52 (Tex. App.—Dallas 2012, no pet.). "[W]hen a fiduciary relationship of agency exists between employee and employer, the employee has a duty to act primarily for the benefit of the employer in matters connected with his agency." *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.). "A party fails to comply with his fiduciary duty "where influence has been acquired and abused, and confidence has been reposed and betrayed. *Etsy v. Beal Bank S.S.B. & CSG Invs.*, 298 S.W.3d 280, 303-04 (Tex. App.—Dallas 2009, no pet.) (quoting *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, pet. denied).

The parties agree that Carnley owed a fiduciary duty to the Center. There is no dispute on this. As an officer for Spindletop Center, Carnley had a duty of loyalty and was not permitted to appropriate company funds for his own personal benefit. *See Ritchie v. Rupe*, 443 S.W.3d 856, 887 (Tex. 2014).

The elements of a common law fraud claim are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew

it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *In re First Merit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001))

The Center's fiduciary duty and fraud claims stem from Carnley's use and misappropriation of Spindletop funds for his personal benefit. The evidence presented against Carnley in support of the Center's claims was simply overwhelming. Most convincingly, the Amazon spreadsheets the Center received from the Beaumont Police Department and the spreadsheet LeBlanc created with the original receipts from Best Buy, conclusively prove Carnley purchased hundreds of personal items. Furthermore, to cover-up his misdeeds, Carnley altered the receipts for these purchases, and submitted the fraudulent receipts to the Center.

As the Center's Chief Information Officer and a member of the Executive Management Team, it is undisputed that Carnley was responsible for purchasing and managing Spindletop Center's IT equipment, computer software, etc. (p. 433, line 19 – p. 438, line 5). As such, he had access to large amounts of company funds. (p. 440, line 14 – p. 441, line .25)

1. **Carnley Misappropriated over Two Hundred Thousand Dollars via Amazon and Best Buy.**

Spindletop's key witness was its Chief Financial Officer, Denise LeBlanc. At the hearing LeBlanc brought two large boxes containing the original credit card statements and documents she gathered and analyzed during her extensive investigation (p. 805). This included the original receipts and statements that Carnley had signed off on and turned into the Center, all of which she has had sole possession over the last two years. (p. 806). One box contained several years of credit card receipts. The other contained the best buy receipts and the spreadsheets. Id.

Although the original documents were not themselves introduced into evidence, true and correct copies were. (P. 807).

During her testimony, LeBlanc presented compelling evidence of records and receipts that had been altered by Carnley. (See, e.g., pp 808-813). She carefully explained the process she used in conducting her investigation and conducting her analysis. After LeBlanc completed her initial investigation, LeBlanc notified the Beaumont Police Department ("BPD") of Carnley's suspicious credit card activities and issued a written statement. (*See* Defendant's Exhibit 26). To obtain information regarding Carnley's purchases, the BPD subpoenaed documents from Amazon for purchases linked to Carnley's company credit card. The BPD provided LeBlanc a spreadsheet the BPD obtained from Amazon for the purchases made on Carnley's company card. (p 815, line 10 – p 817, line 9; *see also* Defendant's Exhibits 10 and 13 – 25).

After she received the Amazon spreadsheet from the BPD, LeBlanc reviewed each purchase to determine whether they had been approved and if they were not, then why not. As she conducted her review, she added two additional columns to the spreadsheet. (p. 813). LeBlanc pulled each receipt and matched the order number from Amazon. In so doing, she could see that while the records and receipts showed one thing, what she ultimate received from Amazon showed another.

After matching the order numbers from the Amazon spreadsheet with the order numbers from the receipts Carnley submitted to Spindletop Center, LeBlanc discovered hundreds of unapproved purchases. (*See* Defendant's Exhibit 14). In addition to the fact the spreadsheets confirmed Carnley had altered description of the items purchased on the receipts, the spreadsheet also confirmed Carnley altered the delivery address on the receipts. *Id.* Most glaringly, Carnley

was having items purchased on the Center's credit card sent to his personal address – the address of a home he was building. (See pp. 813-825).

An astounding number of the purchases showed that Carnley had purchased personal items with the company credit card and submitted altered receipts to Spindletop Center. *Id.* Because LeBlanc also discovered a Best Buy receipt, which was fraudulent on its face, LeBlanc visited Best Buy and obtained the original receipts for purchases Carnley made with his company credit card. (829:23 – 836:20). LeBlanc discovered that Carnley submitted numerous altered receipts for Best Buy purchases. (*Id.*; *see also*, Defendant's Exhibits 20, 21, 65, and 152).

As stated above, at the time Carnley misappropriated company funds, Carnley was in the process of constructing a new home. Consistent with that fact, the purchases for which Carnley submitted fraudulent receipts to Spindletop Center are mostly for items for a home. (*See* Defendant's Exhibit 14 (*e.g.,* line 79, Decorative Cheetah Wall plate).

As shown on the Amazon spreadsheet, Carnley purchased more than 600 personal items from Amazon, and submitted these fraudulent receipts to the Center. (*See* Defendant's Exhibit 14). Additionally, Carnley purchased numerous personal items from Best Buy and submitted altered receipts to the Center. (*See* Defendant's Exhibit 10). The Center relied on the accuracy of Carnley's receipts and approved these purchases with the understanding that Carnley purchased the items shown on the receipts. As a direct result of Carnley's misrepresentations, the Center suffered hundreds of thousands of dollars in damages. (*See* Defendant's Exhibit 391).

Some examples of the evidence demonstrating Carnley's misappropriation of company funds are:

- Carnley's company credit card ended with the digits 7808, the same card used for the fraudulent purchases. (p 631, lines 8-10; *see also*, Exhibit 14).

- Carnley wrote the billing code on receipts which Carnley submitted to Spindletop Center and at the hearing Carnley verified his handwriting on the receipts. (p 632, lines 13-24; p. 747, lines 5-15).

16

- Carnley admitted he had an Amazon account linked to the email "gerald1969@hotmail.com" which was the account used for most of the fraudulent purchases. (p 40, lines 10-22; *see also* Defendant's Exhibit 14).

- Carnley failed to fully alter the item descriptions on some receipts and, as a result, these receipts are fraudulent on their face. (*E.g.*, Defendant's Exhibits 12, 46, and 65).

- Carnley emailed with Best Buy regarding the installation of a wine fridge in his home. (*See* Defendant's Exhibit 9).

- Carnley admitted he purchased the wine fridge, pepper mill, and Pakistani rug. (p 633, line 17 – p 634, line 15; p 513, lines 2-10; p 747, lines 10 – 21; p 752, lines 8-9; p 509, lines 9-11). The receipts for these items are fraudulent on their face. (*See* Defendant's Exhibit 12, 46, and 65). Carnley's explanation that these are not the original receipts Carnley submitted fails because, after Carnley made this allegation, Spindletop Center provided the original receipts for the Arbitrator's review at the hearing. (p 805, line 22 – p 812, line 7).

- The calculations for the total amount billed for items on numerous receipts Carnley submitted to are incorrect. (*E.g.*, Defendant's Exhibits 63 and 74; *see also*, p, 748, line 16 – p 750, line 14).

- Carnley purchased many items to be installed in the home he was building and submitted altered receipts to Spindletop Center. (*See* Defendant's Exhibit 14, lines 13-32, 34-48, 59 – 92, 95-101, etc).

- Carnley admitted he had a template which could be used to create receipts. (p. 647, line 12 – p 648, line 24).

Although Carnley disputes these claims, his testimony was not persuasive, particularly in the face of overwhelming documentary evidence demonstrating his fraud and breach of fiduciary duty. When asked by the panel, "Did you ever make Amazon charges for personal items but use the Spindletop credit card," he stated, "I really don't recall ever doing that." P. 495, lines 14-19. Carnley admitted having Spindletop items purchased on the Spindletop credit card sent to his home. P. 495, lines 20-23. However, he said this was the "rare" occasion. P. 498. He said further that in all the years that he worked at Spindletop, he estimated that he had Spindletop

assets sent to his house "two or three times" and that it was a rare exception. P. 501. Yet, the documents simply do not bear this out.

In total, Carnley misappropriated funds in the following from Spindletop Center:

| | |
|---|---|
| Amazon Retail | 183,329.33 |
| Amazon Digital | 29.98 |
| Amazon Subscriptions | 731.93 |
| Amazon - not on Amazon report | 1,608.46 |
| Best Buy before 08/06/14 | 629.55 |
| Best Buy after 08/06/14 | 23,072.00 |
| Total Amazon and BB Damages | 209,401.25[6] |

2.    **Spindletop's claims regarding Luis Gomero are not as clear**.

Spindletop claims that Carnley misappropriated an additional $205,429.00 using a so-called "Ghost Vendor" – namely Luis Gomero.   Here, the panel is not so persuaded.

First, unlike most ghost vendor schemes in which the name and existence of the vendor is totally made up, here Luis Gomero actually exists and he is an IT consultant.  Indeed, Spindletop admits to having spoken to him to inquire whether he had ever had a contract.  So, the Center tracked him down, spoke to him on the phone, but only asked a single question.  There was simply no follow-up whatsoever.

There is no evidence Luis Gomero did not do the work in question.  There is no evidence Luis Gomero did not receive the checks and payments in question at the address listed on Eagle

---

[6] DX 391.

Creek Lane. There is no evidence Luis Gomero did not live on Eagle Creek Lane. There is no evidence the Mr. Carnley personally benefitted from any payment to Mr. Gomero or that Spindletop did not benefit from the work Mr. Gomero performed.[7]

Essentially, Spindletop bases its ghost vendor claims on four points: (1) Mr. Gomero did not have a log-in and password to access the Spindletop Center's network; (2) there were no emails between Gomero and anyone at the Center, (3) that no one at the Center had heard of Gomero, and (4) that Gomero was doing work that Center employees were already doing.

In response, Jerry Carnley adequately explained these circumstances. First, Gomero did not have a log-in because the work he did was done via remote access using Carley's own log in and password. This allowed Gomero to have access to everything in the Center (which he needed) but only for a limited time, scope, and purpose. Gomero was a highly skilled software engineer with HP in Houston who Carnley had met 20 years ago. Because Spindletop's entire computer infrastructure was HP, Carnley contracted with Gomero for technical assistance at a reduced rate compared to going directly to HP.

Second, virtually all the work that Gomero did was on an as need basis and done while he was on the phone with Carnley, thereby eliminating the need for numerous emails between the two.

Third, Spindletop employed numerous other offsite contractors. And much like Bryan Gauthier was the primary contact for Mike Lorenzen, and Cathy Hartlieb was the primary contact for Qdabra, Jerry Carnley was the primary contact for Gomero. Carnley oversaw the IT department at Spindletop, it is entirely plausible, in fact likely, that he had things going on that

---

[7] Curiously, the backs of the checks were never discussed or entered as evidence.

his subordinates were not aware of. However, people at Spindletop had heard of Gomero as he had a contract with the Center that had been approved as part of the blanket PO process by the Board of Directors.

Fourth, Carnley testified about the work that Gomero performed. Specifically, Gomero did two things, work with Carnley to improve site infrastructure on things like a client portal and cybersecurity and assist Carley in updating network software. Many of these updates were indeed supposed to be done by Center employees, but as Carnley testified, many times the employees would get behind on this work. Gomero stepped in to fill this role, just like the other contractors discussed above. (See, generally pages 528-537).

No one effectly controverted Carnley's testimony regarding Gomero's work for Spindletop, even though there was ample opportunity to have done so. Carnley's dishonest testimony and actions in this case notwithstanding, Spindletop did not carry its burden to prove its claims regarding Gomero, even though it certainly could have. There are so many unanswered questions that the panel finds that Spindletop is not entitled to recover on these specific claims.

## III. <u>AWARD</u>

After considering the pleadings, testimony of the witnesses, Hearing exhibits, the certified Hearing record, the arguments of counsel, and for good cause shown, the Arbitrator has decided in full and final resolution of the issues submitted for determination as follows:

1. Carnley failed to meet his burden for proving a retaliation claim, and accordingly Carnley shall take nothing;

2. The Center's claims for theft and conversion are barred by the statute of limitations, and accordingly Spindletop Center shall take nothing on these claims;

3. The Center sufficiently proved its claims for fraud and breach of fiduciary duty, theft. Therefore, the Spindletop Center is hereby awarded economic damages of $209,401.25;

4. Because the Center's claim for theft is barred by the statute of limitations, it is not entitled to recover on its claim for attorney's fees and costs, and accordingly Spindletop Center shall take nothing on such claim; and,

5. Pursuant to the arbitration agreement, the applicable AAA arbitration rules and the finding and discretion of the arbitrator, the panel finds that the arbitrator's fees and expenses shall be paid and ultimately incurred by Spindletop Center, rather than Jerry Carnley. The panel does not find that Carnley's claims are patently frivolous or filed for the purpose of harassment.

Signed on ___March 8, 2021___

_____
Judge Joseph "Tad" Halbach
Arbitrator